**NOT FOR PUBLICATION**

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

|  |  |  |
|---|---|---|
| ROBERT L. DEWELT, | : | |
| Plaintiff, | : | |
|  | : | Civil Action No. 02-cv-3431 (PGS) |
| v. | : | |
| MEASUREMENT SPECIALTIES, INC., JOSEPH R. MALLON, JR., DAMON GERMANTON, STEVEN P. PETRUCELLI, DAN J. SAMUEL, JOHN D. ARNOLD, and MORTON L. TOPFER, | : | OPINION |
| Defendants. | : | |

**<u>SHERIDAN, U.S.D.J.</u>**

Plaintiff, Robert L. DeWelt, who resigned from his position at Defendant, Measurement Specialties, Inc. ("MSI"), rather than sign what he believed to be fraudulent and misleading financial statements, claims he was constructively discharged in violation of New Jersey's Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1, et seq., and has asserted various common law claims. Defendants have moved for summary judgment on all counts.

I.

Plaintiff was hired by MSI, a publicly traded New Jersey corporation that designs and manufactures sensors and sensor-based products, in August 2001 as Vice President of Finance, Consumer and Sensor Divisions and Acting General Manager of Schaevitz Hampton, a division of MSI. The terms of plaintiff's employment were set forth in a letter dated August 4, 2001. Plaintiff initially reported to Defendant Joseph R. Mallon, Jr. ("Mallon"), Chief Executive Officer and

Chairman of the Board of Directors of MSI. Plaintiff also had functional reporting responsibility to Defendant Damon Germanton ("Germanton"), President, Chief Operating Officer, Secretary, and a Member of the Board of Directors of MSI, and Kirk Dischino ("Dischino"), Chief Financial Officer. Among plaintiff's duties and responsibilities were to define and implement programs for inventory reduction, develop a reporting system to provide operational data to the COO, establish monthly financial, sales, and operations reports, and perform the functions of the General Manager of the Schaevitz Hampton group. In the course of performing these duties, between September and December 2001, plaintiff reviewed some of MSI's financial statements that had been filed with the Securities Exchange Commission ("SEC") and backup documents for those statements. Plaintiff claims to have discovered that financial statements filed with the SEC contained grossly inflated inventory valuation. According to plaintiff, certain capitalized inventory costs were excessive which resulted in an overstatement of the prior period profitability as well as the current inventory value. Plaintiff was troubled because the inventory costs were not based on accurate supportable calculations as far back as June 30, 2000.

Plaintiff brought the production credit issue to Dischino's attention verbally and memorialized his findings in a September 24, 2001 memorandum. However, Dischino dismissed plaintiff's findings and maintained that the existing inventory overhead valuation was compliant with Generally Accepted Accounting Principles ("GAAP") and had been thoroughly audited and approved by Arthur Andersen.

MSI proceeded to prepare and then file its 10-Q, with the allegedly overstated production credits, for the quarter ending September 30, 2001. Thereafter, during the week of November 4, 2001, plaintiff became aware that not only was the production credit not being reduced, but it was

actually being increased by $1.6 million for the November 14, 2002 10-Q filing. Not certain whether his calculations were correct, given the information available to him, plaintiff accepted Dischino's representation of the accuracy of the production credit calculations.

Beginning in November 2001 and ending in December 2001, plaintiff, along with site finance personnel, undertook to verify and clearly establish the accuracy of the value of existing levels of capitalized overhead carried in inventory. Plaintiff concluded that the inventory of IC Sensor, presumably a division of MSI, was overinflated by approximately $3.1 million. The previously recorded inventory overhead was $4.6 million, when, in fact, according to plaintiff, the actual inventory adjustment was about $1.5 million. Plaintiff summarized his findings in a detailed internal memorandum to Mallon, in which plaintiff expressed his belief that this issue must be given the highest priority. Mallon ordered plaintiff to review the issue with Dischino and the auditors and advise whether a restatement would be required. In a December 5, 2001 memorandum to Arthur Andersen, plaintiff requested the accounting firm to complete an in depth review of the basic production credit calculation procedure and the resulting impact on the reported profitability and inventory value for the company to ensure that MSI was compliant with GAAP.

Plaintiff continued to work with corporate and site financial personnel on correcting the current quarter production credit calculations for each of the business units of MSI. Ultimately, the total cumulative impact of the inventory valuation correction reported by MSI in its December 2001 financials was $10.1 million. While the parties did not dispute the amount of the inventory valuation overstatement, there was disagreement over how to handle the overstatement: (1) whether the $10.1 million adjustment should be reported all in the third quarter of 2002; or (2) whether prior period financial statements should be restated. Plaintiff maintained that the overstatement of inventory

values required restatement. According to plaintiff, MSI and Mallon resisted restating the financial statements because they disputed whether GAAP required the company to restate the past financial statements for the periods in which the overstatement of production credit was originally taken or whether MSI could simply report in one period that it had taken the $10.1 million special charge to the costs of goods sold.[1]

On February 15, 2002, following the termination of Dischino, plaintiff was appointed acting CFO. In this new position, according to plaintiff, plaintiff was responsible for signing and submitting MSI's financial statements and disclosure forms to the SEC on behalf of the company. As one of his first assignments as acting CFO, Mallon requested plaintiff to prepare a memorandum setting forth any possible reason for not restating.[2] Although plaintiff maintained that he did not reasonably believe that there were any valid reasons for not restating the company's prior financial statements, plaintiff claims to have been "strong-armed" into preparing the memo of reasons to permit the company not to restate. Plaintiff reluctantly complied and provided the memorandum to the Board of Directors. In the memorandum, dated February 22, 2002, plaintiff stated that MSI should obtain outside advice from a "responsible public accounting firm whose opinion [the

---

[1] Plaintiff speculates as to the reasons why MSI did not want to restate its financials. It is alleged that the production credit had never been disclosed to investors in MSI's public filings, and its retraction was not disclosed in the 10-Q filed on May 31, 2002. Rather, MSI characterized the reason for the $10 million adjustment as "the effect of . . . changes in quantities produced and sold and actual costs incurred." Moreover, plaintiff explains that MSI raised $30 million in a public stock offering in August 2001 and restating prior periods would make the financials used in the public offering false. By taking an adjustment in December 2001, MSI would be able to avoid this conclusion.

[2] Defendants maintain that plaintiff was asked to prepare a memorandum setting forth both sides of the argument on whether a restatement of prior period financial statements might be required.

company] could rely on and whose credibility can be used to show [the company's] complete good faith effort to make an appropriate and complete disclosure."

Subsequently, plaintiff was called upon to assist in preparing another memorandum designed to evaluate the pros and cons of restatement. This "Summary of Macro Production Credit Issues" became the basis for several meetings with Arthur Andersen, PricewaterhouseCoopers (PWC) (who was retained by Mallon merely to assist Mallon in understanding the accounting concepts involved), and RosenfarbWinters, forensic accountants hired by the Special Committee of the Board of Directors. Arthur Andersen advised against restatement, although plaintiff maintains that such a position was held because Arthur Andersen was protecting itself from potential liability to investors in the August 2001 public offering in which Arthur Andersen had audited MSI's financial statements. RosenfarbWinters concluded that it was not necessary for MSI to investigate whether a restatement was required. However, the forensic accounting firm noted that if a material error became known, there is a requirement to correct it and that it must be corrected in the period as to which it relates. PWC offered no opinion on the issue.

In February, 2002, Defendant, MSI, self-reported its issue to the SEC and issued press releases at that time advising of a possible need to restate. On March 13, 2002, Mallon instructed plaintiff to establish a schedule and oversee finalization of the press release concerning the 10-Q for the third quarter ending December 2001, and prepare for the investor conference following release of financials without restatement. As the acting CFO, plaintiff would be required to sign the financial statements that plaintiff believed to be inaccurate and full of material misrepresentations. Furthermore, in participating in drafting a press release, plaintiff was concerned about making misrepresentations to investors. Regardless of whether plaintiff had to sign the financial statements,

5

plaintiff claims to have been apprehensive of the fact that he could be seen as complicit in what he considered to be activities that violated SEC and GAAP regulations.  When plaintiff expressed his concerns, Mallon suggested that plaintiff consult with the company's outside counsel.  Plaintiff, believing such a discussion would be improper, advised that he was going to seek personal counsel, for which Mallon offered that MSI would pay the costs.

Plaintiff consulted counsel on March 18, 2002 and thereafter advised Mallon that he would be submitting his resignation.  Mallon requested plaintiff to wait until after the weekend because the Board would be discussing the restatement issue further.  On March 25, 2002, after being advised that the Board refused to restate the financials, plaintiff submitted his letter of resignation.  In an attempt to dissuade plaintiff from resigning, Mallon claims to have offered plaintiff several alternatives to resignation.  According to Mallon, plaintiff was offered (1) to remain as acting CFO but not sign the 10-Q; (2) a letter stating that it was the Board's decision not to issue a restatement; (3) to move to another role in the company so that plaintiff would not have to sign the 10-Q; and (4) to stay on as a consultant.  Plaintiff maintains that the first option was never offered to him, the second option still required plaintiff to sign the 10-Q, and the third option was the equivalent of a demotion.  Moreover, plaintiff did not believe that a letter from the Board would absolve him from knowing that the company was committing a crime and issuing false and misleading financial statements.  Plaintiff rejected all alternatives and submitted an exit memorandum to the Board dated April 1, 2002 which stated his belief that restatement of prior period financials was necessary and detailed his reasons for resignation.

In its May 2002 10-Q, signed by Mallon as CEO and principal accounting officer, MSI reported plaintiff's findings with regard to the estimated capitalized overhead calculations and

reported an increased net loss of $10.1 million for the quarter ending December 31, 2001. The 10-Q further stated that earnings for prior periods did not need to be restated and that MSI had initiated discussions with the Office of the Chief Accountant of the SEC on the issue.

Following the SEC's mandate prohibiting Arthur Andersen from issuing any opinions or auditing public companies, MSI retained Grant Thornton as outside auditors. As a result of the audit conducted by Grant Thornton, on June 11, 2002, MSI was informed that restatement was required.

The SEC conducted an investigation of MSI in connection with the filing of its financial statements. MSI maintains that the investigation began prior to its 10-Q filing in May 2002 and was the result of MSI's self-reporting. Ultimately, the SEC entered into settlement agreements with MSI and Dischino, who was accused of having engaged in two separate accounting frauds while at MSI. To date, other than Dischino, no individual at MSI has been charged with any fraudulent act.

II.

Under New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-3:

> An employer shall not take any retaliatory action against an employee because the employee . . .
> c. Objects to, or refuses to participate in any activity, policy, or practice which the employee reasonably believes:
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law ···; [or]
> (2) is fraudulent or criminal . . .

A plaintiff who brings an action under this section must demonstrate that: (1) he reasonably believed that his employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy[3]; (2) he performed a "whistle-blowing" activity described

---

[3] At oral argument, defendants contended plaintiff must prove that the employer was actually violating the law, rather than proving the more subjective test that plaintiff reasonably believed the employer was violating the law. The Court can find no support for defendants'

in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *Dwozonar v. McDevitt*, 177 N.J. 451, 462 (2003). "These requirements must be liberally construed to effectuate CEPA's important social goals." *Maimone v. City of Atlantic City*, 188 N.J. 221, 230 (2006)(citing *Green v. Jersey City Bd. of Educ.*, 177 N.J. 434, 448 (2003)).

Defendants argue that the "sine qua non of a CEPA claim is retaliation," which is defined by N.J.S.A. 34:19-2(e) as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." However, this case, according to defendants, is completely devoid of any retaliatory motive or conduct. Defendants do not dispute that plaintiff objected to conduct plaintiff believed to be illegal. Rather, defendants maintain that as a result of plaintiff's objections, the terms and conditions of plaintiff's employment were not adversely affected. After voicing his concerns, plaintiff was asked to be acting CFO and given greater responsibilities. Following the submission of plaintiff's resignation, defendants attempted to convince plaintiff to remain employed by MSI by offering him alternatives to resignation.

However, a plaintiff need not experience discharge, suspension, demotion, transfer, or loss of income. An employer's conduct that fall short of such actions, may nonetheless be the equivalent of an adverse action. *Cokus v. Bristol-Myers Squibb Co.*, 362 N.J.Super. 366, 378 (Law. Div. 2002), aff'd, 362 N.J.Super. 245 (App. Div.), certif. denied, 178 N.J. 32 (2003)(citing *Smith v. St. Louis Univ.*, 109 F.3d 1261 (8th Cir. 1997). It is clear that "other adverse employment action taken against an employee," as contemplated by N.J.S.A. 34:19-2(e) includes constructive discharge, which

---

contention.

8

plaintiff here alleges.  A constructive discharge occurs when the employer has imposed upon an employee working conditions "so intolerable that a reasonable person subject to them would resign." *Muench v. Township of Haddon*, 255 N.J.Super. 288, 302, 605 A.2d 242 (App.Div.1992).

> Thus, in a constructive discharge situation, a violation occurs at the point where a reasonable employee is compelled to resign due to the employer's action. *At that point, the employer has engaged in a retaliatory action*. The employee cannot change the intolerable conditions imposed by the employer by demonstrating loyalty or excellent work performance. The employer cannot rescind a constructive discharge. The harm has been done when the employee feels compelled to resign.

*Daniels v. Mutual Life Ins. Co.*, 340 N.J. Super. 11, 17 (App. Div. 2001) (emphasis added).

Defendants, though, argue that plaintiff has not made out a case for constructive discharge because plaintiff voluntarily resigned, points to no action on the employer's part that contemplates "outrageous, coercive and unconscionable" conduct, *Shepherd v. Hunterdon Dev. Ctr.*, 174 N.J. 1, 28 (2002), and no effort was made by plaintiff to remain employed.  *Cokus*, 362 N.J.Super. at 378.

Certainly, "[n]ot every employment action that makes an employee unhappy constitutes an actionable adverse action." *Id.*  However, plaintiff maintains "MSI adopted a deliberate and knowing course to hide [a] fraud that had been committed in the financial statements" and that plaintiff was being required to participated in the fraud.  It is argued that being asked by an employer to commit a possible crime for the employer is an intolerable condition sufficient to give rise to a constructive discharge.  Although plaintiff has a huge hurdle to prove the three alternatives of employment offered by Mallon constitute constructive discharge, this is an issue for the jury to decide.

III.

Defendants next seek summary judgment for plaintiff's state law claims, including plaintiff's *Pierce*[4], prima facie tort, and breach of contract claims, based upon CEPA's waiver provision. Under the CEPA waiver provision, "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J.S.A. 34:19-8. "The unambiguous language of the New Jersey provision indicates that by filing a claim under CEPA, a plaintiff waives his or her right to assert claims for the same conduct." *Palladino ex rel. United States v. VNA of S. N.J., Inc.*, 68 F.Supp.2d 455, 470 (D.N.J.1999). The waiver provision applies to claims that are "substantially related" to the CEPA claim. *Bowen v. Parking Auth. of Camden*, 2003 WL 22145814 *38 (D.N.J.) (citing *Young v. Schering Corp.*, 275 N.J.Super. 221, 238 (App. Div. 1994), aff'd, 141 N.J. 16, 31 (1995)). It includes all rights and remedies that are available when an employee is wrongfully discharged for disclosure, in an attempt to prevent multiple claims based upon the same issue. *Young*, 141 N.J. at 29-30. Conversely, claims that do not require a showing of retaliation and require a showing of different proofs are not waived by the institution of the CEPA claim. *Kadetsky v. Egg Harbor Twp. Bd. of Educ.*, 82 F.Supp.2d 327, 342 (D.N.J.2000) (citing *Young*, 141 N.J. at 32).

---

[4] New Jersey law provides that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Pierce v. Ortho Pharmaceutical Corp.*, 417 A.2d 505, 512 (N.J.1980). "The sources of public policy include legislation; administrative rule[s], regulations or decisions; and judicial decisions." *Id.* However, when "the sources of public policy [upon which a defendant relies] are coterminous with his statutory claims, he cannot advance a separate common law public policy claim." *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 73 (3d Cir.1996) (citing *Catalane v. Gillian Instrument Corp.*, 638 A.2d 1341, 1349 (App. Div. 1994)).

Plaintiff acknowledges the waiver provision and offers that he "is not seeking to recover under both statutory and common law claims." Rather, plaintiff points to the Supreme Court of New Jersey's opinion in *Young v. Schering Corp.*, 141 N.J. 16 (1995), for the proposition that dismissing the claims under the waiver provision would be premature. *Young* provides:

> Although the waiver provision does not use language of estoppel, "institution of an action" may be susceptible of meaning something other than the filing of a complaint as contemplated by Rule 4:2-2. The meaning of "institution of an action" could conceivably contemplate an election of remedies with restrictions in which the election is not considered to have been made until discovery is complete or the time of a pretrial conference contemplated by Rule 4:25-1.

*Id.* at 32. While discovery in this matter is complete, there would appear to be little, if any, prejudice to defendants to permit the election subsequent to a decision on this motion.

IV.

In light of the Court's decision to allow plaintiff time to elect its remedies and not dismiss, at this time, the Court will address defendants' substantive arguments related to such claims. Defendants seek to dismiss plaintiff's *Pierce* claim because plaintiff did not report the alleged wrongdoing to outside authorities or take other effective action. Defendants rely on *House v. Carter-Wallace, Inc.*, 232 N.J. Super. 42, 49 (App. Div.) cert. denied, 117 N.J. 154 (1989), for the proposition that "no New Jersey case has recognized a claim for wrongful discharge based solely upon an employee's internal complaints about a corporate decision, where the employee has failed to bring the alleged violation of public policy to any governmental or other outside authority or to take other effective action in opposition to the policy." While *House* cited to *Lepore v. National Tool and Manufacturing Co.*, 224 N.J. Super. 463, 540 A.2d 1296 (App. Div. 1988), certif. granted

111 N.J. 642, 546 A.2d 553 (1988) and *Cerracchio v. Alden Leeds, Inc.*, 223 N.J. Super. 435, 538 A.2d 1292 (App. Div. 1988), both of which permitted a claim for wrongful termination where the discharged employee actually reported the alleged workplace safety violations to the Occupational Safety and Health Administration. That court also cited to *Kalman v. Grand Union Co.*, 183 N.J. Super. 153, 443 A.2d 728 (App. Div. 1982), which allowed an action to proceed where a pharmacist was discharged for refusing to close a pharmacy while other parts of the store in which it was located remained open, in violation of rules of the Board of Pharmacy.

Therefore, while "a mere difference of professional opinion between an employee and those with decision making power in a corporation is not a sufficient basis to establish a wrongful discharge," *House*, 232 N.J. Super. at 49 (citing *Pierce*, 84 N.J. at 75), plaintiff's actions in this case, by refusing to sign the financial statements would seem to be sufficient "effective action" under *Kalman* to permit plaintiff's *Pierce* claim to proceed.

V.

Defendants maintain that plaintiff's CEPA claim against the individual defendants should be dismissed for lack of individual liability under CEPA. In support of this contention, defendants rely on *Higgins v. Pascack Valley Hospital*, 158 N.J. 404 (1999). However, the District Court addressed *Higgins* in *Palladino v. VNA of Southern New Jersey*, 68 F.Supp.2d 455 (D.N.J. 1999), where the Court noted that:

> despite the fact that the issue of individual liability under CEPA was squarely before it, the Court chose not to address the trial court's holding that there is no individual liability under CEPA, avoiding the issue by finding that, on the record before the Court, the facts would not support individual liability anyway. [] Presumably the Supreme Court would not look to whether there was individual liability if the law did not allow for individual liability.

12

*Id.* at 474.

Although the case law on the issue is scant, given the present state of the law, it appears that individual liability may apply. "[D]icta and implications from various other New Jersey Supreme Court and District of New Jersey cases support an interpretation of N.J.S.A. 34:19-2(a) which allows for individual liability." *Palladino*, 68 F.Supp.2d at 472-73. The scope of that liability, however, is not so clear. CEPA explicitly applies liability to "employers" which it defines as:

> any individual, partnership, association, corporation *or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent* and shall include all branches of State Government, or the several counties and municipalities thereof, or any other political subdivision of the State, or a school district, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof.

N.J.S.A. 34:19-2(a) (emphasis added). Supervisors are such individuals who act on behalf of the employer with the employer's consent, and are defined by CEPA as:

> any individual with an employer's organization who has the authority to direct and control the work performance of the affected employee, who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains, or who has been designated by the employer on the notice required under section 7 of this act.

N.J.S.A. 34:19-2(d).

Recognizing that the Legislature's intent in enacting CEPA was remedial, and therefore, CEPA should be construed liberally, the District Court previously held that CEPA "creates individual liability for agents of the employer, including supervisory employees." *Palladino*, 68 F.Supp.2d at 473, 476. But it would also follow that members of the Board of Directors constitute persons or group of persons acting directly or indirectly on behalf of or in the interest of an employer

13

with the employer's consent. Nonetheless, the Court is troubled with regard to Defendants Samuel, Arnold, and Topfer, who were outside members of the Board and not employed by MSI. Although they decided against restatement, there is little proof they were aware that their acts impacted plaintiff's employment. However, there is no requirement that such "person or group of persons" be employees of the employer, but must merely act "directly or indirectly on behalf of or in the interest of an employer with the employer's consent." As such, drawing all inferences favorable to plaintiff, it is premature to dismiss against the outside directors. Certainly, if Defendants Samuel, Arnold, and Topfer fit within the category of "employers" under N.J.S.A. 34:19-2(a), so too must Defendants Mallon, Germanton, and Petrucelli. Moreover, these individuals, could be considered supervisors, particularly Mallon who had "the authority to direct and control the work performance" of plaintiff. Additionally, Defendants Mallon (CEO), Germanton (COO), and Petrucelli (CTO), had apparent "authority to take corrective action regarding the violation of the law, rule or regulation of which the [plaintiff] complain[ed]." N.J.S.A. 34:19-2(d).

The overbreadth of such a statutory construction was examined in an unreported District Court opinion. *See, Bower v. Parking Authority of the City of Camden*, 2003 WL 22145814 (D.N.J.). That Court appears to have the same reluctance as this one regarding personal liability, but it too felt compelled to allow the jury to decide. The *Bower* Court stated:

> This Court recognizes the defendants' fear that allowing suits against all of these defendants under the terms of CEPA's "employer" definition could "open[ ] the door..." and allow suit against the Commissioners who "did not have authority to act alone, but rather acted as members of the Board." [] CEPA, though, will not impose liability on any employee, supervisor, commissioner, or attorney unless the plaintiff proves that the defendant took an adverse employment action against him because of his whistleblowing...Thus, this Court has not considered whether each individual defendant is

> individually liable for a CEPA violation here, but has instead found that, should plaintiff be able to prove a causal relationship between the individual defendants and the adverse employment decision, as well as the other factors necessary to prove a CEPA claim, he will be able to hold them responsible as agents of the [employer].

*Bower*, 2003 WL 22145814 *23 (D.N.J.) (internal citations omitted).[5]

Given this district's view of the state of the law as to individual liability in CEPA actions, defendants' motion for summary judgment is denied and leaves plaintiff to its proofs as to whether each individual defendant "took an adverse employment action against him because of his whistleblowing." *Bower*, 2003 WL 22145814 *23 (D.N.J.).

VI.

With regard to defendants' motion for summary judgment as to plaintiff's claim for punitive damages, the Court first notes that such damages are recoverable pursuant to N.J.S.A. 34:19-5. That statute states, in part:

> Upon the application of any party, a jury trial shall be directed to try the validity of any claim under this act specified in the suit. All remedies available in common law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any legal or equitable relief provided by this act or any other statute. The court shall also order, where appropriate and to the fullest extent possible:
>     \*\*\*
> (f) Punitive damages...

---

[5] Considering the Court's previous decision to permit the plaintiff's common law claims to remain, at least for the time being, the Court acknowledges defendants' argument to dismiss plaintiff's claims for individual liability under common law. For the same reasons expressed to hold the individual defendants liable under CEPA, plaintiff's *Pierce* and prima facie tort claims against the individual defendants should proceed. As explained in *Barratt v. Cushman & Wakefield*, 144 N.J. 120, 126 (1996), CEPA is a codification of the Supreme Court's ruling in *Pierce*. Therefore, it would seem contradictory to find that individual liability could not be obtain from the original source of CEPA, when the plain reading of the statute permits the imposition of such liability.

N.J.S.A. 34:19-5.

The Court acknowledges the "stricter standard" for imposing liability for punitive damages in CEPA actions. *Abbamont v. Piscataway Tp. Bd. of Educ.*, 138 N.J. 405, 419 (1994). The Supreme Court of New Jersey has explained that "in CEPA actions, 'the employer should be liable for punitive damages only in the event of actual participation by upper management or willful indifference.'" *Id.* (citing *Lehmann v. Toys R' Us, Inc.*, 132 N.J. 587, 625 (1993)). In that same opinion, the court noted the stricter standard imposed by the Appellate Division: "A greater threshold than mere negligence should be applied to measure employer liability for punitive damages; they are to be awarded when the wrongdoer's conduct is especially egregious but only in the event of actual participation by upper management or willful indifference." *Id.* (quotations omitted). After a thorough analysis, the Supreme Court of New Jersey resolved that "[b]ecause punitive damages are part of common-law tort claims..., the remedy of punitive damages herein should be decided by a jury, as it is in common law tort actions." *Id*. at 433. The Court is mindful of the corrective steps undertaken by MSI, and is unconvinced that the proofs are sufficient to warrant submission of punitive damages to a jury; but they are sufficient to defeat summary judgment.

## VII.

Based on the foregoing, the motion for summary judgment is denied. The plaintiff shall make an election of remedies within ten days hereof by submission of a form of Order dismissing

certain counts.  If defendants object to the form or scope of the said proposed Order, they shall submit the objections within five days thereof.


February 15, 2007						S/ *Peter G. Sheridan*					
								PETER G. SHERIDAN, U.S.D.J.